NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13422

COMMONWEALTH  vs.  WILLIAM J. CAMUTI.


Middlesex.     November 3, 2023. – February 21, 2024.

Present (Sitting at Lowell):  Budd, C.J., Gaziano, Lowy, Kafker,
Wendlandt, & Georges, JJ.[1]


Deoxyribonucleic Acid.  Practice, Criminal, Postconviction
     relief, Assistance of counsel.  Evidence, Scientific test.
     Homicide.



Indictments found and returned in the Superior Court
Department on October 3 and November 15, 2013.

A postconviction motion for forensic testing, filed on
April 16, 2021, was heard by Christopher K. Barry-Smith, J., and
a motion for reconsideration was considered by him.


Dana J. Gravina for the defendant.
Hallie White Speight, Assistant District Attorney, for
the Commonwealth.


GEORGES, J.  In 2013, the defendant, William J. Camuti,

killed his long-time friend and business associate, Stephen

---

[1] Justice Lowy participated in the deliberation on this case
prior to his retirement.

Rakes, by poisoning him with potassium cyanide, and then disposed of the victim's body in a wooded area and lied to the police about the events surrounding the victim's death.  A Middlesex County jury subsequently convicted the defendant of, among other charges, murder in the first degree.

Several years later, the defendant filed a motion for forensic testing under G. L. c. 278A, seeking an order authorizing deoxyribonucleic acid (DNA) testing of the shirt that the victim was wearing when his body was discovered.  After a nonevidentiary hearing, a Superior Court judge denied the motion, finding that the defendant had failed to meet his burden under G. L. c. 278A, § 7 (b), to establish that a reasonably effective defense attorney would have sought to test the victim's shirt for DNA.  We affirm.

1.  Background.  "We summarize the facts presented at the hearing on the motion for forensic testing, which included relevant trial transcripts and exhibits."  Commonwealth v. Linton, 483 Mass. 227, 229 (2019).

a.  The police investigation.  On July 17, 2013, a jogger discovered the victim's body in the woods near a State highway in Lincoln.  A forensic pathologist with the office of the chief medical examiner later determined that the cause of death was acute cyanide toxicity.

On the side of the road where the victim's body was found, Lincoln police officers discovered what appeared to be drag marks of perhaps heels "striking and pulling on the ground." The victim's shirt had been pulled up in the areas near the victim's shoulders, neck, and armpits, and there was mud on the back of his heel. Although a photograph of the victim's body was presented to the jury to show the areas where the shirt was pulled up, the shirt itself was never admitted in evidence at trial.

The police later learned that, at the time of his death, the victim was involved as a potential witness in a Federal trial against James "Whitey" Bulger. Additionally, the victim had a civil judgment against Bulger, and was looking to sell the judgment and the rights to his story involving the matter. The defendant was a long-time friend of the victim; the two were also business collaborators, having been involved in several real estate deals together. Due to their business dealings, the defendant owed the victim $100,000. The defendant had also been helping the victim market the movie rights to the victim's involvement with Bulger.

After determining that the defendant was the last person the victim had called, investigators proceeded to interview him multiple times. The defendant's account of his last day with the victim varied with each interview. The police first spoke

with the defendant at his home on July 18, 2013.  During the interview, the defendant told the police that, on July 16, 2013, at approximately 1:30 P.M., he met the victim at a fast-food restaurant in Waltham to discuss a real estate venture in the Dorchester section of Boston.  Upon arrival, the defendant purchased two iced coffees and met with the victim inside the restaurant.  The defendant claimed that, at the conclusion of their meeting, which lasted about fifteen minutes, he left while the victim remained inside the restaurant.  The defendant also told the police that the victim was not feeling well on the day of the meeting.

After the initial interview, the police went to the restaurant, where they discovered the victim's car, still parked in the front parking lot.  The police called the defendant and interviewed him a second time.  During this interview, the police informed the defendant that there were cameras at the restaurant and asked him if he had taken the victim anywhere after their meeting.  In response, the defendant's memory of the meeting had changed.  This time, the defendant told the police that, although he and the victim arrived at the restaurant at the same time, the defendant had already gone inside and purchased two iced coffees, which they consumed inside the defendant's vehicle during the course of their meeting.  The defendant's account of what happened after the meeting had also

changed.  He now asserted that, after their meeting at the restaurant, the defendant proceeded to drive the victim to an office supply store in Waltham; however, the victim ended the ride abruptly, indicating that he had another meeting.  The defendant claimed to have then dropped the victim off by the side of the fast-food restaurant.

On July 19, 2013, the police executed a warrant to search the defendant's residence.  During the search, the police officers discovered business documents linking the victim to the defendant, as well as a receipt from the fast-food restaurant, dated July 16, 2013, at 1:07 P.M., for two iced coffees.  The police also discovered an e-mail printout titled "Gmail RE: Response for offer potassium cyanide," in which a seller provided a quote for potassium cyanide products.  Another e-mail printout seized by the police indicated that the prospective buyer was a "Jewelry lab working with precious metals and required a very small amount of potassium cyanide."  The contact information that was listed for the "[j]ewelry lab" was the defendant's cell phone number.  A search of the defendant's laptop computer also revealed two Internet address links referencing potassium cyanide.  One of those addresses led to a webpage where the following question was posted:  "Can I mix potassium or potassium cyanide in hot coffee or tea and drink it?  Will it work?"  A response posted on the webpage said,

"Only if you have a death wish.  Even a small amount of cyanide is fatal."[2]

The police also searched the defendant's vehicle pursuant to a warrant.  Neither the victim's latent fingerprints nor blood was found.  The car, however, had a global positioning system (GPS) device that tracked its movements on July 16, 2013.  The data from the GPS device showed that at 12:02 P.M., the defendant's car left his residence in Sudbury.  At 12:28 P.M., the vehicle stopped at a supermarket in Waltham.[3]  At 1 P.M., the vehicle arrived at the fast-food restaurant in Waltham.  At 1:12 P.M., the vehicle was driven around the block before it returned to the restaurant at approximately 1:20 P.M., where it remained stationary for about thirty minutes.  At approximately 2:07 P.M., the vehicle arrived at a movie theater in Woburn, where it remained stationary until 2:46 P.M.  After that, the defendant drove around, stopping at various locations, including an 8:50 P.M. stop at the location where the victim's body was found.  After that stop, the vehicle was driven to the defendant's Sudbury home.

---

[2] Another response also discussed ways to mask the bitter taste of cyanide with sugar, stated that a lethal dose varies depending on a person's body weight, and provided the range of what would be considered lethal doses.

[3] The police located a receipt from the supermarket dated July 16, 2013, at 12:31 P.M., for the purchase of latex gloves.

While the search warrant was being executed at his house, the defendant was interviewed for the third time at the Lincoln police department.  Initially, when asked what happened on July 16, he recounted the events of that day just as he had during the second interview.  However, when questioned further by the police, the defendant claimed that, following the meeting with the victim at the fast-food restaurant, he drove the victim to a movie theater parking lot in Woburn.  The police told the defendant that they did not believe his account of the events and asked him whether he had ever purchased or researched potassium cyanide.  The defendant initially denied purchasing potassium cyanide, but later admitted that he had done so.  He also said he did not know whether he had researched potassium cyanide.

A day later, on July 20, 2013, the defendant was hospitalized after attempting suicide.[4]  The police interviewed the defendant on July 21 and July 23, 2013, while he was recovering at the hospital.  The defendant had been administered various medications, including a morphine drip, fentanyl, gabapentin, hydromorphone, and oxycodone.  During the hospital interviews, the defendant confessed to killing the victim by

---

[4] While the defendant was hospitalized, the police executed a warrant to search his storage locker in Waltham.  The police located additional documents related to the victim.

placing potassium cyanide in his coffee. The defendant also told the police that he drove around with the victim in his car while waiting for the potassium cyanide to take effect before stopping and dragging the victim's body from the car once it was dark outside and leaving it in the same location where the victim's body was found.

b. The trial. i. Theories of defense. At trial, the defendant pressed three defenses: (1) the defendant's confession at the hospital was not voluntary based on his medical condition at the time; (2) there was no proof that the victim was deliberately poisoned by potassium cyanide; and (3) there was no forensic or DNA evidence connecting the defendant to the murder.

With respect to the voluntariness of the defendant's confession, on cross-examination, the police officers who had interviewed the defendant when he was in the hospital conceded that the defendant never said that he killed the victim during his interviews prior to being hospitalized. The police officers also acknowledged that the defendant only admitted to killing the victim once he was hospitalized in the intensive care unit with serious injury. The arresting officers also testified that once the defendant had been arrested, he requested an attorney and did not make any more statements. Additionally, defense

counsel offered expert psychiatric testimony about the supposed involuntariness of the defendant's confession.

Next, as for the cause of the victim's death, a forensic pathologist from the office of the chief medical examiner testified that she performed an autopsy on the victim and determined that the cause of death was acute cyanide toxicity. She further testified on cross-examination that no medical history confirmed whether the victim had been exposed to other possible sources that could cause cyanide poisoning, such as fires or metal working, and that persons receiving certain blood pressure medications can have elevated blood levels of potassium. Defense counsel also elicited testimony that while the amount of cyanide present in the victim's blood was toxic, whether it was lethal varied by individual, and argued that the Commonwealth had not proved that the victim ingested a lethal dose.

Finally, regarding the forensic connection between the defendant and the murder, a State police trooper, who conducted the trace evidence examination of the victim's body, testified at trial. On cross-examination, the trooper admitted that he was unaware of what, if any, trace evidence was recovered from the body, because the information was sent out for forensic testing, and he was unaware of the results. Defense counsel also elicited testimony from the police that there was no blood

or DNA from the victim in the defendant's storage facility, home, or car.

For its part, the Commonwealth offered expert testimony regarding the collection and analysis of DNA evidence from a crime scene specialist who worked for the State police crime laboratory, but who did not personally perform any DNA testing in this case. While the crime scene specialist testified that DNA might be collected from the armpit of a shirt depending on the circumstances, he also testified that the outside of a shirt, again depending on the circumstances, is not a "pristine" source for collecting a DNA sample. The crime scene specialist explained that although it would be possible to obtain DNA from a shirt if someone "shed[ded] a considerable amount," DNA would not necessarily be present just because someone had touched the shirt.

On cross-examination, defense counsel asked whether skin cells can be transferred from one person to another, and the crime scene specialist answered affirmatively. Defense counsel also confirmed that the crime scene specialist never looked for potential DNA samples on the victim's body for analysis.

ii. Defense counsel's closing argument. In his closing, defense counsel argued that the Commonwealth introduced largely circumstantial evidence that did not make up for the lack of direct evidence establishing that the defendant murdered the

victim and disposed of his body.  Defense counsel strenuously emphasized that there was "zero trace evidence" connecting the defendant to the crime scene or the victim's body, whether "biological, DNA, fingerprint, or of another nature."  Lastly, defense counsel pointed out that the "[forensic pathologist] could not on cross-examination . . . tell you if the amount of cyanide found in [the victim's] femoral blood samples or gastric sample was lethal or fatal in the case."

c.  Procedural history.  On October 3, 2013, a Middlesex grand jury returned four indictments against the defendant, charging attempted murder, G. L. c. 265, § 16; unlawful disposition of a human body, G. L. c. 114, § 43M; and two counts of willfully misleading a police officer in a criminal investigation, G. L. c 268, § 13B.[5]  A fifth indictment, for murder, G. L. c. 265, § 1, was returned on November 15, 2013.  The jury trial commenced on April 3, 2017, and after seventeen days of trial, the jury found the defendant guilty of murder in the first degree based on deliberate premeditation, unlawful disposition of a human body, and both counts of willfully misleading a police officer in a criminal investigation.  The

_____

[5] On April 25, 2017, the Commonwealth filed a notice of nolle prosequi as to the charge of attempted murder.

defendant appealed from his convictions on May 1, 2017. His direct appeal has yet to be docketed.

On April 16, 2021, the defendant filed a motion under G. L. c. 278A, § 3 (§ 3), seeking DNA testing of the victim's shirt. On September 17, 2021, a Superior Court judge, who did not preside at the defendant's trial, ruled that the defendant had met the requirements of § 3 and could proceed to a hearing under G. L. c. 278A, § 7. Following a nonevidentiary hearing, the judge issued an order denying the defendant's motion. The defendant filed a notice of appeal and a motion for reconsideration of the denial of his motion for postconviction DNA testing. On January 3, 2023, his motion for reconsideration was denied. This appeal ensued.

2. Discussion. a. Statutory framework. The Legislature enacted G. L. c. 278A "as a means to permit prompt access to scientific and forensic testing in order to remedy wrongful convictions" (citation omitted). Linton, 483 Mass. at 234. General Laws c. 278A involves a two-step procedure for requesting postconviction forensic testing. See Commonwealth v. Wade, 467 Mass. 496, 501 (2014) (Wade II), S.C., 475 Mass. 54 (2016). First, a court must determine whether a party's motion for postconviction forensic testing meets preliminary criteria

set forth in G. L. c. 278A, § 3.[6]  See id.  If the motion for
forensic testing has satisfied these preliminary requirements, a
judge "shall order a hearing on the motion."  G. L. c. 278A,
§ 6 (a).

Second, the moving party has the burden to demonstrate by a
preponderance of the evidence each of six factors set forth in
G. L. c. 278A, § 7 (b).[7]  The third factor, § 7 (b) (3), which is

_____

[6] The motion must include the following:

"(1) the name and a description of the requested forensic
or scientific analysis; (2) information demonstrating that
the requested analysis is admissible as evidence in courts
of the commonwealth; (3) a description of the evidence or
biological material that the moving party seeks to have
analyzed or tested, including its location and chain of
custody if known; (4) information demonstrating that the
analysis has the potential to result in evidence that is
material to the moving party's identification as the
perpetrator of the crime in the underlying case; and (5)
information demonstrating that the evidence or biological
material has not been subjected to the requested analysis
because [of one of five reasons enumerated in G. L.
c. 278A, § 3 (b) (5)]."

G. L. c. 278A, § 3 (b).

[7] The moving party has the burden to establish:

"(1) that the evidence or biological material exists; (2)
that the evidence or biological material has been subject
to a chain of custody that is sufficient to establish that
it has not deteriorated, been substituted, tampered with,
replaced, handled or altered such that the results of the
requested analysis would lack any probative value; (3) that
the evidence or biological material has not been subjected
to the requested analysis for any of the reasons in clauses
(i) to (v), inclusive, of paragraph (5) of subsection (b)
of [§] 3; (4) that the requested analysis has the potential
to result in evidence that is material to the moving

the center of the dispute in this case, requires the moving

party to show that the requested test has not been performed on

the evidence or biological material at issue for one of the

following five reasons:

> "(i) the requested analysis had not yet been developed at the time of the conviction;
>
> "(ii) the results of the requested analysis were not admissible in the courts of the commonwealth at the time of the conviction;
>
> "(iii) the moving party and the moving party's attorney were not aware of and did not have reasons to be aware of the existence of the evidence or biological material at the time of the underlying case and conviction;
>
> "(iv) the moving party's attorney in the underlying case was aware at the time of the conviction of the existence of the evidence or biological material, the results of the requested analysis were admissible as evidence in courts of the commonwealth, a reasonably effective attorney would have sought the analysis and either the moving party's attorney failed to seek the analysis or the judge denied the request; or
>
> "(v) the evidence or biological material was otherwise unavailable at the time of the conviction."

G. L. c. 278A, § 3 (b) (5).  See G. L. c. 278A, § 7 (b) (3).

Here, the defendant relies on § 3 (b) (5) (iv); thus, the

defendant as the moving party was required to demonstrate by a

---

> party's identification as the perpetrator of the crime in the underlying case; (5) that the purpose of the motion is not the obstruction of justice or delay; and (6) that the results of the particular type of analysis being requested have been found to be admissible in courts of the commonwealth."

G. L. c. 278A, § 7 (b).

preponderance of the evidence that a reasonably effective attorney would have sought DNA testing of the shirt but failed to do so.

b. Standard of review. Where, as here, the motion judge was not the trial judge, and the record purely is documentary, we regard ourselves in as good a position as the motion judge to assess the trial record. See Commonwealth v. Moffat, 478 Mass. 292, 298 (2017), S.C., 486 Mass. 193 (2020). Because the motion judge was not required to make credibility determinations or consider the relative weight of the evidence or the strength of the case presented against the moving party, we stand in the same position as the motion judge in determining whether the defendant demonstrated by a preponderance of the evidence that a reasonably effective attorney would have sought DNA testing of the victim's shirt. See Linton, 483 Mass. at 233-234. Accordingly, we review the denial of the defendant's motion pursuant to G. L. c. 278A, § 7, de novo. See id.

c. Application. The defendant asserts on appeal that a reasonably effective attorney would have sought a DNA analysis of the victim's shirt, and that his attorney failed to do so. The Commonwealth contends that the lack of trace evidence connecting the defendant to the scene where the victim's body was found coupled with the Commonwealth's purported failure to conduct available forensic analysis played a pivotal role in the

defendant's strategy at trial. As such, the Commonwealth asserts that a reasonably effective attorney would not have sought the DNA testing of the victim's shirt because DNA evidence from the shirt could have further inculpated the defendant and, thus, undermined this important defense. Under the circumstances of this case, we agree with the Commonwealth.

The inquiry under § 3 (b) (5) (iv) whether a reasonably effective attorney would have sought the requested testing is objective. See Commonwealth v. Wade, 475 Mass. 54, 63 (2016). As we have previously explained, unlike in a motion for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), the reasonably effective attorney prong of G. L. c. 278A, § 3 (b) (5) (iv), does not require the defendant to establish that trial counsel's strategic decision to forgo forensic testing was manifestly unreasonable. See Linton, 483 Mass. at 237. Rather, the statute requires a showing only that a reasonably effective attorney would have sought the requested analysis, not that every reasonably effective attorney would have done so. See Wade II, 467 Mass. at 511. Therefore, the defendant here would be entitled to postconviction forensic testing of the victim's shirt if he, by a preponderance of the evidence, has shown that "a" hypothetical reasonably effective attorney would have chosen to undertake testing in these circumstances. See Linton, supra at 238.

That is not to say that the permissive standard under § 3 (b) (5) (iv) is without limits. See Linton, 483 Mass. at 237-238. In Linton, the defendant sought postconviction forensic testing of a "questioned hair." See id. at 237. The precise source of the hair, and whether it came from the victim, or an extraneous source, was unknown. See id. Like the shirt in this case, the hair was never tested or introduced at trial. See id. Nevertheless, the absence of testing was a prominent aspect of Linton's defense. See id. at 238. In his closing, Linton's trial counsel relied "on the uncertainties concerning the hair to argue that [the] police were deliberately not testing evidence in an effort to locate other suspects because they had focused improperly upon the defendant as the only suspect." Id. There was other inculpatory evidence in Linton, such as a test result showing that the defendant was a possible contributor to the DNA found under the victim's fingernails. See id. In isolation, both the DNA found under the victim's fingernails and the hair could have been easily explained by the victim's marriage to Linton. See id. However, considering both the test result showing that Linton was a possible contributor to the DNA found under the victim's fingernails and the trial counsel's emphasis on the absence of information concerning the hair, we could not conclude that a reasonably effective attorney

would have tested the hair, and accordingly affirmed the order denying Linton's motion for postconviction testing.  See id.

Here, the defendant argues that while the absence of trace evidence played a minimal role in his defense, the fact that the victim's shirt was not tested played no role at all in his trial defense strategy.  To be clear, the defendant does not dispute that his trial counsel emphasized the lack of trace evidence linking him to the crime scene.  Instead, he makes a nuanced distinction that, in referring to a lack of trace evidence, his trial counsel was not referencing the absence of DNA testing of the victim's shirt, but rather the absence of footprints and tire impressions where the victim's body was discovered, as well as the absence of the victim's DNA in the defendant's vehicle, home, and storage unit.  This distinction is not meaningful in any sense.

The general lack of trace evidence, including forensic evidence on any object or in any location linking the defendant to the victim's death, was a prominent theory of his defense. First, throughout the trial, defense counsel repeatedly focused on the purported weaknesses in the police investigation, emphasizing that the police could have collected DNA or other trace evidence but failed to do so.  Second, as the defendant himself points out in his argument, defense counsel elicited testimony from the police that there was no blood or DNA from

the victim found in the defendant's car, storage unit, or home. Indeed, the defendant's trial counsel consistently focused on the theory that nothing directly linked the defendant to the victim's body or the crime scene. Thus, had the victim's shirt been tested, and if the results came back showing that the defendant's DNA was present on the shirt, the defendant's theory that the Commonwealth's case was entirely circumstantial and unsupported by physical evidence would have been torpedoed.

On the other hand, had the test been ordered and the results came back positive for a third party's DNA, the potentially exculpatory value of this evidence would have been marginal at best. While searching the defendant's car, the police discovered a receipt, dated July 16, 2013, at 12:31 P.M., for the purchase of latex gloves. An absence of the defendant's DNA on the victim's shirt could have easily been explained by the reasonable inference that the defendant was wearing latex gloves while disposing of the victim's body. Moreover, considering that, as stated by the State police crime scene specialist at trial, clothing seldomly provides a "pristine" DNA sample and that there are inherent difficulties interpreting such results, coupled with the fact that no theory of a third-party culprit was sufficiently developed at trial, any presence of a third party's DNA would have had minimal exculpatory value.

Under these circumstances, we cannot say that a reasonably effective attorney would have risked undermining the defendant's strongest defense in favor of throwing a "Hail Mary"[8] by requesting a DNA test on the victim's shirt.  Accordingly, the defendant has not met his burden to show that a reasonably effective attorney would have sought such testing at the time of his trial.

The order denying the motion for postconviction testing is affirmed.

So ordered.

---

[8] In football, a "Hail Mary" is a long pass made in desperation into the end zone with little time remaining and with only a small chance of success.  Although the chance of success is grim, it is not zero.  Doug Flutie did, after all, complete arguably the most famous Hail Mary to secure a victory for Boston College over the University of Miami in 1984.  See Commonwealth v. Lys, 481 Mass. 1, 11 n.8 (2018).